# IN THE COURT OF APPEALS OF IOWA

No. 17-1536
Filed December 6, 2017

**IN THE INTEREST OF J.S., T.K., & C.K.,**
**Minor Children,**

**P.S., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Bremer County, Peter B. Newell, District Associate Judge.


        The mother appeals the termination of her parental rights to her children, C.K. and T.K., and the permanency order placing her child, J.S., in the sole custody of his father.  **AFFIRMED.**


        Mark A. Milder of Mark Milder Law Firm, Waverly, for appellant mother.

        Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

        Linnea Nicol of the Juvenile Public Defender's Office, Waterloo, for minor children.


        Considered by Danilson, C.J., and Doyle and Mullins, JJ.

**DANILSON, Chief Judge.**

The mother appeals the termination of her parental rights to her children, C.K. and T.K.,[1] and the permanency order placing her child, J.S., in the sole custody of his father.[2] The mother asserts the district court erred in giving weight to the mother's hair-stat test results in reaching its determinations. The mother also contends it is in C.K. and T.K.'s best interests to be returned to her care, or in the alternative, to be placed in a guardianship. Because we conclude there are grounds for termination of the mother's parental rights to C.K. and T.K. and for the placement of J.S. in the sole custody of his father, and the court's determinations are in the children's best interests, we affirm.

**I. Background Facts & Proceedings.**

At the time of the combined termination and permanency hearing, J.S. was fourteen years old, C.K. was eight, and T.K. was seven. The Iowa Department of Human Services (DHS) became involved with the family in September 2015 due to concerns of methamphetamine use by the mother. This was not the first time the family had formal interactions with DHS due to methamphetamine-related concerns.[3] The children were removed from the mother's care in December 2015. C.K. and T.K. were placed in family foster care, and J.S. was placed in the sole custody of his father. The children's

---

[1] C.K. and T.K.'s father's parental rights were also terminated. He does not appeal.
[2] J.S. has a different father than C.K. and T.K.
[3] DHS became involved with the family in 2007, when J.S. tested positive for methamphetamine, and again in 2009, when the father of C.K. and T.K. was arrested for manufacturing methamphetamine.

removal stemmed from the mother's continued use of methamphetamine and the mother's and father to C.K. and T.K.'s continued ties to the drug culture.[4]

Though the mother obtained substance-abuse and mental-health treatment, consistently attended visitation with the children, and participated in DHS services throughout the pendency of this matter,[5] she was not able to demonstrate honesty about her use of methamphetamine or provide negative hair-stat tests. The mother tested positive for methamphetamine by hair-stat testing on August 5 and September 2, 2016, and January 18, February 22, April 9, June 22, July 3, and August 23, 2017. The last positive hair-stat test was on the second day of the termination and permanency hearing—the district court left the record open for admission of the test results. The mother contended her last use was September 2016; however, a DHS caseworker testified hair-stat testing can only provide positive results if a person has used within the last ninety days.

When asked at the termination and permanency hearing, the DHS caseworker explained the meaning of the string of hair-stat test results showing methamphetamine in the mother's system:

> It meant that from each one of those dates there was a use and what they tell us, train us, what they say, is that for it to show up in a hair-stat there had to be three uses in that 90-day time period. We're not going to catch one use, so what that would tell me is that well, we have consistently had use from January through June.

---

[4] At one point during the pendency of this matter there was concern for C.K. and T.K.'s safety due to their father's involvement and self-admitted prominent position in the drug culture, requiring C.K. and T.K. to be placed in a sequestered foster home.

[5] The mother also obtained employment about three months prior to the termination and permanency hearing. The mother had not been employed for approximately two years. She was terminated from her last job as a nurse in 2015 after she was charged with crimes related to taking medication from the care center.

The mother argued the hair-stat tests could be coming back positive due to exposure from her environment rather than actual methamphetamine use. The mother pointed out that her urinalysis tests through her substance-abuse treatment at Pathways and those submitted as a part of the mother's probation were negative for illegal substances. The mother submitted twenty-nine urinalysis tests through Pathways and three as a condition of her probation—all negative for illegal substances. However, the DHS caseworker testified the urinalysis tests were submitted in correlation with her scheduled Pathways appointments and two out of three of the tests submitted as part of the mother's probation were scheduled, meaning "of the [thirty-one] tests I talked about that were conducted by Pathways or Corrections, one of those tests w[as] done where [the mother] couldn't have anticipated the probability of testing." The DHS caseworker further testified the window for picking up methamphetamine in a person's system by way of urinalysis is typically only forty-eight hours. The DHS caseworker also testified Pathways does not typically send urinalysis tests to a laboratory for further testing. The mother's Pathways treatment coordinator testified all the urinalysis tests taken through Pathways are observed but admitted "there's probably always a way" to substitute urine even while being observed. Ultimately, the district court determined:

> [T]he hair-stat testing is credible evidence of ongoing methamphetamine usage. The mother's ability to avoid the detection of her methamphetamine usage while providing urine samples is evidence of duplicity and not abstinence. The urine tests that the mother took did not occur randomly. She submitted urine samples when she was scheduled to have appointments with her substance abuse counselor. These tests were not forwarded to a laboratory for further testing.

After a combined termination and permanency hearing held July 21 and August 23, 2017, the court terminated the mother's parental rights to C.K. and T.K. pursuant to Iowa Code section 232.116(1)(f) and (*l*) (2017). The court also ordered the sole custody of J.S. to be transferred to his father pursuant to section 232.104(2)(d)(2). The mother appeals.

## II. Standard of Review.

We review termination-of-parental rights and child-in-need-of-assistance (CINA) proceedings de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014) (termination); *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014) (CINA). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *A.M.*, 843 N.W.2d at 110. In both cases, the best interests of the children is our primary concern. *See In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006); *J.S.*, 846 N.W.2d at 40.

## III. Analysis.

*1) Hair-Stat Testing.* The mother first contends the court erred in giving weight to the hair-stat tests showing positive results for methamphetamine in determining termination of the mother's rights to C.K. and T.K. and confirmation of J.S. as a CINA was necessary. The mother asserts hair-stat testing is of questionable reliability and should not have been relied upon by the court. The mother argues the court should have given more weight to the negative urinalysis tests completed through her substance-abuse treatment instead. However, the mother cites no Iowa authority supporting the argument hair-stat testing is unreliable and should not be utilized by courts. We therefore will not address this issue. *See* Iowa R. App. P. 6.903(2)(g)(3).

*2) Grounds for Termination—C.K. & T.K.* The mother also challenges the court's finding grounds for termination of her parental rights to C.K. and T.K. Section 232.116(1)(f) provides the court may order the termination of parental rights where the child is four years of age or older; has been adjudicated a CINA; has been out of the parent's care for at least twelve months of the last eighteen months, or for the last twelve consecutive months; and it is established by clear and convincing evidence the child cannot be safely returned to the parent's custody at present. C.K. and T.K. were both over the age of four at the time of the termination hearing and had been adjudicated CINA and out of the mother's care for nearly two years.

The mother argues the State has failed to show the children could not be returned to her care safely because the only factor supporting the children's continued removal was the string of positive hair-stat tests. The mother cites to *In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016), and asserts the State failed to show a nexus between the mother's alleged methamphetamine use and safety concerns for the children. In *M.S.*, this court found no adjudicatory harm supporting termination of a father's parental rights where the father provided illegal substance tests positive for THC during the pendency of the CINA proceeding because there were no additional safety concerns. 889 N.W.2d at 682-83. We also note our supreme court has stated, "[W]e do not believe general statements about methamphetamine addiction are enough by themselves to prove that a child is imminently likely to suffer physical harm under section 232.2(6)(b)." *J.S.*, 846 N.W.2d at 42. However, despite the mother's effort and participation in DHS services, the record in this case establishes that

due to the mother's long-standing methamphetamine addiction there exists potential harm to the children if returned to her care.

This is not the first time the family has been brought to the attention of DHS due to the mother's substance-abuse issues. The mother testified she has been addicted to methamphetamine since 2006, and DHS was involved with the family as early as 2007 due to J.S. testing positive for methamphetamine. The mother has shown an inability to maintain sobriety. The mother provided a number of hair-stat tests positive for methamphetamine—the last on the very same day as the second day of the termination and permanency hearing. Despite the continued indication of use via hair-stat testing, the mother denied using methamphetamine since September 2016. This indicates the mother's inability to be honest about her use. A behavior-health-intervention specialist who worked with the mother and the children testified dishonesty is a bar to recovery in that it is usually a sign of relapse or a sign relapse will likely occur. Throughout the pendency of these proceedings, the mother's substance-abuse issues resulted in criminal charges and caused the mother to be unemployed. The mother only obtained employment again a few months prior to the termination and permanency hearing. Although the mother has exhibited effort to meet the requirements imposed by DHS, her inability to be fully honest about her use of methamphetamine and to achieve sobriety cause significant instability that makes it impossible for her to safely parent the children. There is clear and convincing evidence C.K. and T.K. could not be safely returned to the mother's care at the time of the termination hearing. We agree with the district court that

there are grounds supporting the termination of the mother's parental rights to C.K. and T.K. under section 232.116(1)(f).[6]

*3) Best Interests.* The mother maintains it is in C.K. and T.K.'s best interests to be returned to her care. In determining whether termination is in the children's best interests, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2).

C.K. and T.K. have been in a state of instability for nearly two years while waiting for the mother to maintain sobriety and exhibit she can safely parent the children. They deserve permanency. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and provide a stable home for the child." *A.M.*, 843 N.W.2d at 112 (citation omitted). C.K. and T.K. are placed in family foster care with their aunt and uncle who provide a safe and nurturing environment for the children and who are willing to adopt them. Their best interests are served by terminating the mother's parental rights.

Alternatively, the mother maintains it is in C.K. and T.K.'s best interests for a guardianship to be created rather than terminate the mother's parental rights. The mother cites to *In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017), in

---

[6] We need only find termination appropriate under one of the sections asserted to affirm. *In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014).

support of this contention. In *B.T.*, this court determined placing the child in a guardianship with the grandmother was appropriate, stating, "This is not a case where the child's future placement will remain in limbo if the mother's parental rights are not terminated." 894 N.W.2d at 34. There, we noted the mother had "had successful years of sobriety" and the grandmother had always protected the child. *Id.* The same is not true here.

In any event, by requiring under section 232.104(4)(a) that the court find termination would not be in the children's best interests prior to entering a guardianship, "[t]he legislature has categorically determined 'the needs of a child are promoted by termination of parental rights' if the grounds for termination of parental rights exist." *In re L.M.F.*, 490 N.W.2d 66, 68 (Iowa Ct. App. 1992) (quoting *In re M.W.*, 458 N.W.2d 847, 850 (Iowa 1990)). In this case, placing C.K. and T.K. in a guardianship would not provide permanency. A guardianship requires annual review by the court[7] and would provide the mother repeated opportunities to contest the court's determination the children should not be placed in her custody. This would leave the children in limbo—perhaps hoping they will be returned to their mother's care or hoping they will not—and is not in C.K. and T.K.'s best interests. Termination of the mother's parental rights and adoption of the children by their aunt and uncle will provide protection for the children and allow the children the sense of stability they deserve.

*4) Permanency Order—J.S.* The mother also challenges the court's order placing J.S. in the sole custody of his father pursuant to Iowa Code section

---

[7] *See* Iowa Code § 232.104(8)(a).

232.104(2)(d)(2). Section 232.104(2)(d)(2) provides after a permanency hearing, the court shall enter an order, pursuant to the findings required by section 232.104(4), to "[t]ransfer sole custody of the child from one parent to another parent." Section 232.104(4) in turn requires:

> Prior to entering a permanency order . . . convincing evidence must exist showing that all of the following apply:
>     a. A termination of the parent-child relationship would not be in the best interests of the child.
>     b. Services were offered to the child's family to correct the situation which led to the child's removal from the home.
>     c. The child cannot be returned to the child's home.

The mother asserts the record does not support the finding J.S. could not be returned to the shared-care arrangement between her and J.S.'s father that was in place prior to the commencement of these proceedings. As explained above, the mother's failure to acknowledge her continued use and to achieve and maintain sobriety stands in the way of her ability to provide a safe environment in which to parent her children. We agree with the district court's determination that placement of J.S. in the mother's care would be contrary to J.S.'s welfare. We affirm the court's order placing J.S. in the sole custody of his father.

**IV. Conclusion.**

We find the district court did not improperly consider the mother's hair-stat test results in reaching its determinations, there are grounds for termination of the mother's rights to C.K. and T.K., termination is in C.K. and T.K.'s best interests, and no section 232.116(3) factor weighs against the need for termination. We also find there are grounds for placement of J.S. in the sole custody of his father pursuant to section 232.104(2)(d)(2). We therefore affirm.

**AFFIRMED.**